FILED

2010 Aug-04  PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **EZZARD CHARLES TORAIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-08-S-1438-NE** |
| | ) | |
| **JOHN M. HOUSTON,** | ) | |
| **COMMISSIONER, THE STATE** | ) | |
| **OF ALABAMA DEPARTMENT** | ) | |
| **OF MENTAL HEALTH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ezzard Charles Torain, filed this case on August 12, 2008.[1]  His amended complaint, filed December 23, 2008, asserts claims against his former employer, John M. Houston, the Commissioner of the Alabama Department of Mental Health, for "Deprivation of Civil Rights Under Color of State Law"; race and color discrimination; age discrimination; and retaliation.  He relies upon the following federal statutes:  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. §§ 1981, 1983, and 1988; and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("the ADEA").[2]

---

[1]*See* doc. no. 1 (Complaint).  Plaintiff filed his original complaint *pro se.*  However, the court subsequently appointed Michael E. Auffenorde, an attorney, to represent him.  *See* doc. no. 3.  Mr. Auffenorde filed an amended complaint on plaintiff's behalf on December 23, 2008.  Doc. no. 5.

[2]*See* doc. no. 5 (Amended Complaint).

The case currently is before the court on defendant's motion for summary judgment on all of plaintiff's claims.[3]   Upon consideration of the motion, the pleadings, the briefs, and the evidentiary submissions, the court concludes the motion is due to be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

---

[3]Doc. no. 18.

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

Defendant, John M. Houston, is the Commissioner of the Alabama Department

of Mental Health ("the Department").  The Department is an agency of the State of

Alabama that was created by statute to "act in any prudent way to provide mental

health services and intellectual disability services for the people of Alabama."  Ala.

Code § 22-50-9 (1975) (2006 Repl. Vol. & 2009 Supp.).  *See also* Ala. Code §§ 22-

50-2 & 22-50-2.1 (1975) (2006 Repl. Vol, & 2009 Supp.).  The Department operates

a facility called North Alabama Regional Hospital ("the Hospital") in Decatur,

Alabama, for the treatment of individuals with serious mental illnesses.  The Business Office of the Hospital handles all of the Hospital's accounts payable, accounts receivable, and employee payroll matters.[4]  Even so, the Business Office does not actually issue or collect checks for payroll or accounts.  Instead, Business Office employees provide payroll and account information to the Department's Bureau of Finance, which in turn provides information to the Alabama Finance Department, which actually issues checks or collects accounts.[5]

Plaintiff, Ezzard Charles Torain, is an African-American male who was born in 1954.[6]  He completed a program of study in computer-based payroll processing at the United States Army School of Administration in 1976.  He also received an Associate's Degree in Accounting and Computer Information Systems from Calhoun State Community College in 1987, as well as a Bachelor's Degree in Accounting and Business Administration from Athens State University in 1989.[7]  While he was in school, plaintiff took classes in computer programming, keyboarding, and information systems.[8]

Plaintiff was employed by the Department during three time periods.  He

---

[4]Defendant's evidentiary submission, Tab 1 (Affidavit of Charles Cutts), at 2.

[5]Defendant's evidentiary submission, Tab 2 (Affidavit of Roger Kalonick), at 2.

[6]Defendant's evidentiary submission, Tab 4, at 6.

[7]Defendant's evidentiary submission, Tab 6 (Deposition of Ezzard Torain), at 40, 44-46.

[8]*Id.* at 186.

worked at the Department's Lurleen B. Wallace Development Center ("the Wallace Center") from April 20, 1977 to July 12, 1979, and again from October of 1979 to October of 2003, when the Wallace Center closed.  During his years at the Wallace Center, plaintiff served as a Hospital Orderly, Mental Health Worker I, Mental Health Worker II, Habilitation Training Specialist, and Administrator I.[9]  As an Administrator I, plaintiff was responsible for accounts payable, contracts, billing, vouchering, and auditing.[10]  Through his work experience with the Department, plaintiff has learned to use computers for electronic mail, word processing, internet searches, accounting, and payroll processing.[11]

On November 1, 2006, plaintiff began working as an Accounting Assistant I at the Hospital, and he held that position until the termination of his employment on July 27, 2007.[12]  When plaintiff applied for the Accounting Assistant I position, he did not emerge as the top-ranked applicant after the interview process.  Charles Cutts, the Director of the Hospital and the final decisionmaker, nonetheless chose plaintiff for the job because plaintiff had a long history of working for the Department.[13]

The job description for an Accounting Assistant I includes the following

---

[9]Defendant's evidentiary submission, Tab 3 (Affidavit of Greg Ethridge), at 1-2.

[10]Torain Deposition, at 62.

[11]*Id.* at 186-88.

[12]Ethridge Affidavit, at 2.

[13]Plaintiff's evidentiary submission, Tab 13 (Deposition of Charles Cutts), at 17-19.

duties:  data processing entry, audit, and review; maintenance of a systematic set of employee payroll records; verifying data entered for correctness; operating and maintaining computer devices; serving as a back-up to various other duties and functions of the Business Office; and performing other duties related to the purchasing function and general operations of the Business Office.[14]   More specifically, as Accounting Assistant I, plaintiff was the supervisor for all payroll functions at the Hospital.  He was in charge of collecting time cards from all Hospital employees, verifying the accuracy of all information on the cards, correcting any errors on the cards, entering the information into the state payroll system, reviewing and correcting entries prior to paychecks being issued, and auditing and correcting any errors identified after the checks are issued.  Plaintiff also was responsible for accounts payable for goods and services received by the Hospital, including the following:  creating a payment voucher form, entering the transaction into the computerized accounting system, and mailing the payment voucher and required supporting documentation to the Department's Accounts Payable Section.[15]

Plaintiff received on-the-job training on how to handle payroll, accounts payable, individual accounts, insurance, Medicaid, and other aspects of his job.[16]  He

---

[14]Defendant's evidentiary submission, Tab 7, at 1.

[15]Defendant's evidentiary submission, Tab 2 (Affidavit of Roger Kalonick), at 2.

[16]Torain Deposition, at 134-35.

also "occasionally" consulted with other employees when he had questions about how to do his job.[17]  When plaintiff first started as an Accounting Assistant I on November 1, 2006, he faced a backlog of work, some of which dated as far back as 2004.[18]  Plaintiff often worked extra hours, including nights and weekends, in order to eliminate the backlog.[19]  Plaintiff's immediate supervisor, Roger Kalonick, informed plaintiff that he would not receive any compensatory time or overtime compensation for the extra hours he worked,[20] but plaintiff's time records indicate that he did receive up to six hours of compensatory time.[21]

Plaintiff's job performance was evaluated according to the performance appraisal system developed by the Alabama Personnel Department.  Greg Ethridge, the Hospital's Personnel Director, described the appraisal system as follows:

> This system provides an opportunity for the supervisor to:  communicate with an employee about his/her work responsibilities and related work habits; monitor performance; provide feedback on a regular basis, as well as at the end of the appraisal period; reward and reinforce the employee's performance.  The appraisal system also allows for a corrective action plan to be developed for an employee when there are problems with performance.
>
> The three phases of the appraisal period for both probationary and

---

[17]*Id.* at 137-39.

[18]*Id.* at 82-84.

[19]*Id.* at 74-80.

[20]*Id.* at 159-60.

[21]*See* doc. no. 29 (defendant's reply brief), at Exhibit 1.

permanent employees are the Preappraisal, Midappraisal, and Final Appraisal.   For a permanent employee, the appraisal process is continuously conducted throughout a twelve-month period.   An individual must satisfactorily complete a six month probationary period to become a permanent employee.  However, pursuant to State Personnel procedure, the six-month probationary period may be extended up to a total of one year, allowing for two three-month extensions.

Throughout the appraisal period, the rating supervisor observes, documents, coaches, counsels, and provides feedback to the employee. Prior to the final appraisal phase, the rating and reviewing supervisors meet to discuss and agree on the employee's ratings/score.   The reviewing supervisor is the rating supervisor's immediate supervisor.

The appraisal documents rate employees with respect to the employee's various responsibilities.  These ratings are compiled into an overall score which falls into one of the following categories:  Does Not Meet Standards, Partially Meets Standards, Meets Standards, Exceeds Standards, or Consistently Exceeds Standards.[22]

In order for an exempt employee (such as plaintiff) to complete his probationary period, he must perform in a satisfactory manner during the working test period.[23]

Each appraisal form is signed by a rating supervisor (the employee's direct supervisor) and a reviewing supervisor (the rating supervisor's direct supervisor). For each appraisal form received by plaintiff while working as an Accounting Assistant I, the rating supervisor was Roger Kalonick, the Hospital's Business Manager and plaintiff's direct supervisor.  The reviewing supervisor was Charles

---

[22]Ethridge Affidavit, at 2.

[23]*Id.*

Cutts, the Hospital Director and Kalonick's direct supervisor.[24]

Three other Hospital policies are relevant to plaintiff's claims. According to Hospital Policy 60-17:

> Any employee whose evaluation is below the "meets standards" level will have a corrective action plan drawn up at or within (10) days after the evaluation to assist him or her to improve their performance to at least minimal acceptable standards for the position.
>
>> a.   This plan will be written, will be developed jointly by the employee and the supervisor, and will specify activities and responsibilities for both parties, and interim goals which must be met by the employee. A copy of this plan will be retained by the supervisor and the employee, and copies will be forwarded to the appropriate discipline or department head. If satisfactory progress has not been made by the end of the third (3rd) month, the employee will be considered for disciplinary action to include dismissal.[25]

The Absenteeism policy (Hospital Policy No. 60-42) provides that "[a]n employee may be considered as having an attendance problem if he/she is absent without prior approval more than six (6) occasions within twelve (12) consecutive months."[26]  The level of discipline an employee will receive for excessive unscheduled absences is progressive, with ten occasions within a twelve-month

---

[24]*Id.*

[25]Plaintiff's evidentiary submission, Tab 9, at document bearing Bates Stamp No. 000970.

[26]Plaintiff's evidentiary submission, Tab 10, at document bearing Bates Stamp No. 000813. An "occasion of absence" is "an absence for one hour or more or all of one (1) work day or consecutive work days without prior approval," unless the absence is covered by the Family and Medical Leave Act of 1993. *Id.* at document bearing Bates Stamp No. 000812.

period resulting in termination.[27]

Finally, the Personal Leave policy (Hospital Policy No. 60-65) states that all employees "are entitled to one personal leave day each year," but emphasizes that "[e]mployees should schedule the personal leave day with supervisors."[28]

On February 2, 2007, Kalonick conducted a "Midappraisal" session with plaintiff, to evaluate his performance during the first half of the appraisal period. On the Midappraisal form, Kalonick stated that plaintiff's strengths included his attitude toward other people, and his ability to show up for work on time and ready to work. On the other hand, Kalonick also indicated that plaintiff needed improvement in the following areas:

**Payroll**
Need to refer back to written instructions when dealing with payroll issues before calling someone for help.
Need to keep written instructions when other knowledgeable people provide guidance.
Need to stop relying on others to do primary job functions.
Must learn to stand on your own as you have already processed eight payroll cycles.

**Accounts Payable**
Must learn the terminology. Seem confused by what a LDO and/or a PO are, still don't seem to understand direct pays.
Must be much more timely regarding processing payments.

---

[27]*Id.* at document bearing Bates Stamp No. 000813.

[28]Plaintiff's evidentiary submission, at Tab 11.

10

**Computer Skills**

Need to develop a higher degree of familiarity with your computer.

Seem to have difficulty with passwords and computer navigation.

Need to develop the ability to use your computer as a tool to do your job.[29]

Plaintiff also received an "Employee Working Test Period Appraisal Form" dated April 18, 2007, and signed by himself, Kalonick, and Cutts. Plaintiff received a Performance Appraisal Score of 15.7 out of a possible 40, resulting in a rank of "Partially Meets Standards." Plaintiff received a "Plan of Correction" signed by Kalonick on April 16, 2007, but he was allowed to continue in his position through the working test period. The Plan of Correction stated:

The following Plan of Correction is implemented as of this date to ensure that you are able to perform assigned job tasks at an acceptable level before you are granted permanent job status.

1. Need to refer back to written instructions when dealing with payroll issues before calling someone for help. **This continues to be a problem that has been identified by others.**

2. Need to keep written instructions when other knowledgeable people provide guidance. **I see no evidence of this being done. Call backs to ask the same question over and over continue to occur.**

3. Need to stop relying on others to do primary job functions. **Continue to use Barbara and Gloria in this manner.**

---

[29]Defendant's evidentiary submission, Tab 7, at 2-3 (emphasis in original).

**Likewise with timekeepers.**

4.  Must learn to stand on your own as you have already processed eight payroll cycles.  **It's time to cut the strings and do your job as assigned.**

5.  **Using some forms that are no longer in use.  The Comptroller's Manual is available on-line and contains all current forms that you need.**

6.  Must learn the terminology.  Seem confused by what a LDO and/or a PO are, still don't seem to understand direct pays.  **Significant improvement has been seen in this area.**

7.  Must be much more timely regarding processing payments.  **Significant improvement has been seen in this area.  Most invoices are being handled on a daily basis as required.**

8.  Need to develop a higher degree of familiarity with your computer.  **This remains an on-going issue.**

9.  Seem to have difficulty with passwords and computer navigation.  **This remains an on-going issue.  Progress has been seen in this area.**

10.  Need to develop the ability to use your computer as a tool to do your job.  **This remains an on-going issue.**[30]

Because of plaintiff's low score on the April 18 Working Test Period

Appraisal, Cutts requested permission from the Alabama Director of Personnel to

---

[30]Defendant's evidentiary submission, Tab 9, at 1-3 (emphasis in original).

12

extend plaintiff's probationary period an additional three months.[31]   The request

apparently was granted, because plaintiff continued in his position as Accounting

Assistant I.   Plaintiff received another Midappraisal evaluation for his extended

probationary period on June 28, 2007.   The grading form again listed plaintiff's

strengths as a good work attitude and consistently showing up on time for work.

Much more significant, however, were the areas in which plaintiff still needed

improvement:

1.   **Payroll**
   a.   Need to refer back to written instructions when dealing with payroll issues before calling someone for help.  **This continues to be a problem that has been identified by others.  <u>This area seems to be improving through this date, however, recurring processing errors still remain.</u>**

   b.   Need to keep written instructions when other knowledgeable people provide guidance.  **I see no evidence of this being done.  Call backs to ask the same question over and over continue to occur.  <u>This seems to be improving.</u>**

   c.   Need to stop relying on others to do primary job functions.  **Continue to use Barbara and Gloria in this manner.  Likewise with timekeepers.  <u>This area also appears to be improving.</u>**

   d.   Must learn to stand on your own as you have already processed eight payroll cycles.  **It's time to cut the strings and do your job as assigned.  <u>I have received written</u>**

---

**feedback that you continue to have problems resolving pay issues where the same mistake is repeating causing staff members to be paid incorrectly and adversely affecting their individual payments. My larger concern is whether or not other staff are also being paid incorrectly without their knowledge.**

e.   **Using forms that are no longer in use.   The Comptroller's Manual is available on-line and contains all current forms that you need.  Resolved.**

2.   **Accounts Payable**

a.   Must learn the terminology.  Seem confused by what a Contract Field voucher, LDO and/or a PO are, still don't seem to understand direct pays.  **Significant improvement has been seen in this area.   You still are having problems understanding how to process different sets of documents for payment.**

b.   Must be much more timely regarding processing payments.  **Significant improvement has been seen in this area.  Most invoices are being handled on a daily basis as required.  On June 7th, we received five vouchers that were returned by the central office because of processing errors, mostly missing documents.  This remains unacceptable.**

c.   **When processing end of month reports for May I found two occasions where a contract field voucher was entered incorrectly resulting in a double payment to the contractor.  One payment was made against the contract and one payment was made as a direct pay medical bill.  This has created a problem with the contractor and for this office as we now try to handle this overpayment.  It also expensed funds critical to meet direct pay medical vendor payments. See item 2a**

14

**above.**

3.     **Computer Skills**

  a. Need to develop a higher degree of familiarity with your computer. **This remains an on-going issue. <u>Continues to improve.</u>**

  b. Seem to have difficulty with passwords and computer navigation. **This remains an on-going issue. Progress has been seen in this area. <u>No change.</u>**

  c. Need to develop the ability to use your computer as a tool to do your job. **This remains an on-going issue. <u>No change.</u>**

4.     <u>**Work Availability — Call-ins are now becoming a problem and seem to be escalating into a reliability issue.**</u>

  a. <u>**The occasion received on June 5th had a very negative impact on the payroll cycle because it resulted in your inability to key required information into the system resulting in incorrect payment of 18 staff members. This in turn forced us to increase our contingency fund on an emergency basis and make payments from this account to each individual.**</u>

5.     <u>**Each of these issues must be resolved within the next two weeks in order to resolve your probationary employment. A final recommendation will be made to the facility director on July 13, 2007.**</u>[32]

When plaintiff received a copy of the foregoing Midappraisal form, it was

stapled to a copy of a newspaper article from the April 25, 2007 edition of *The*

---

[32]Defendant's evidentiary submission, at Tab 12 (all emphasis in original).

*Decatur Daily*.[33]  The article reads, in its entirety, as follows:

> The Alabama House and Senate approved separate resolutions apologizing for slavery Tuesday — one day after the official state holiday for Confederate Memorial Day.

> The House used an unrecorded voice vote to approve an apology resolution sponsored by Rep. Mary Moore, D-Birmingham.  About an hour later, the Senate voted 22-7 for an apology resolution sponsored by Sen. Hank Sanders, D-Selma.

> "An apology goes a long way.  Some of us can't begin to heal until we have an apology.  Some of us can't move into reconciliation until we have an apology,"  Sanders said.

> Arthur Orr, R-Decatur, abstained from the Senate's vote. Attempts to contact Orr were unsuccessful.

> Roger Bedford, D-Russellville; Tom Butler, D-Madison; and Zeb Little, D-Cullman, who represent other area districts, voted in favor of the Senate's resolution.

> Neither resolution will become official unless approved by the other chamber and signed by the governor.

> Legislatures in Virginia, Maryland and North Carolina have approved similar slavery apologies this year.

> "It's been a long time coming," Moore said.

> The vote came as the legislature resumed work after state offices were closed Monday for Confederate Memorial Day, and it occurred across the street from the building that served as the capital of the Confederacy.

> Moore's resolution expresses state government's "deepest

---

[33]Torain Deposition, at 104-17; plaintiff's evidentiary submission, at Tab 1.

sympathies and solemn regrets to those were enslaved and the descendants of slaves, who were deprived of life, human dignity, and the constitutional protections accorded all citizens of the United States."

It also encourages "the remembrance and teaching about the history of slavery, Jim Crow laws, and modern day slavery, to ensure that these tragedies will neither be forgotten nor repeated."

Sanders' resolution says "an apology for centuries of brutal dehumanization and injustices cannot erase the past, but confession of the wrongs can speed racial healing and reconciliation."

The House and Senate acted after turning back efforts to turn the apology into an expression of regret for slavery.

"What I have a problem with is apologizing for something I didn't do," said Rep. Jay Love, R-Montgomery, who tried unsuccessfully to rewrite Moore's resolution.  His proposal was tabled 46-41.

Moore said the legacy of slavery continued through Jim Crow laws that existed during many legislators' lifetimes, and the legacy lingers today with white flight from public schools and job discrimination.

Opposition came from white Republicans who expressed concern the resolutions would be used to seek reparations.

Moore and Sanders agreed to add language that said the resolutions were not intended to be used as the basis for lawsuits.

Sen. Charles Bishop, R-Jasper, said he didn't want to be portrayed as a racist for fighting the resolution.  "What I am is somebody who hates to see lawyers take advantage of the General Fund of the State of Alabama and suck it like a leech," he said.

Sanders, a lawyer, said, "I didn't bring this resolution to lay a

foundation for a lawsuit."[34]

Plaintiff developed his own hand-written Plan of Correction in response to the June 28, 2007 Midappraisal evaluation.  He explained why some of his performance problems had been occurring, offered suggestions about how to improve in certain areas, and requested to be scheduled for any training his supervisors thought would help improve his performance.[35]  Plaintiff attempted to discuss his Plan of Correction with Kalonick, but Kalonick stated he would talk about the plan later.[36]  The record does not indicate whether the two men ever met to discuss the Plan of Correction.

Roger Kalonick sent a memo to Charles Cutts regarding plaintiff's employment status on July 12, 2007.  The memo reads:

> The following information is intended to summarize my current evaluation of Charles Torain as we approach the end of his probationary status (first extension).
>
> My most recent feedback session was held on 6/28/07 and included the following:
>
> Payroll — Have received feedback from two different timekeepers regarding recurring problems with several employees from different classifications.  Same mistakes being repeated.  Failure to input one direct care payroll batch prior to system shut-down resulted in using the Contingency Fund to ensure staff were paid (affected 18 staff).  At

---

[34]Phillip Rawls, *Slavery Apology on the Way? House, Senate Approve Resolutions; Republicans Concerned About Reparation Suits.*, Decatur Daily, April 25, 2007, available at http://www.decaturdaily.com/decaturdaily/news/070425/apology.shtml.

[35]*See* attachment to plaintiff's evidentiary submission, Tab 1.

[36]Plaintiff's evidentiary submission, Tab 1, at 5.

issue in a large sense is my complete lack of confidence in his ability to accurately enter payroll.

Accounts Payable — On June 7th, five payment vouchers were returned by the Central Office for correction (mostly for missing documents). When processing my end-of-month reports for May I found two occasions where a contract field voucher was entered incorrectly resulting in duplicate payments to the same vendor. On 7/12/07 Central Office found a problem with a payment to Valley Services where only one invoice was entered and sent leaving five others unpaid.

Work Availability – Has received five occasions since January with the most recent being on 6/6/07.

Later that day I received a written response to my feedback session that has raised additional questions regarding his understanding of the position.

We have provided sufficient training and resources for Charles to be successful in this position yet he has failed to capitalize on the opportunity. I must also admit that I should have gotten someone else trained in this area along with Charles. However, at this point I feel it is imperative that we train up a backup person as we resolve this issue. Robin Vest will fill this requirement as we move forward.

Nevertheless, my recommendation is to terminate his employment at this time.[37]

Kalonick also met with Cutts on the same day (July 12, 2007) to discuss plaintiff's job performance. During that meeting, Cutts made the decision to terminate plaintiff's employment due to his failure to adequately perform his job duties. Cutts asked Kalonick and Greg Ethridge, the Hospital's Personnel Manager,

---

[37]Defendant's evidentiary submission, at Tab 13.

19

to meet with plaintiff and inform him of the termination decision.  That meeting occurred on July 27, 2007.  Kalonick and Ethridge explained to plaintiff that he had not made sufficient progress in the performance of his job duties despite being provided multiple opportunities to improve, and that, as a result, his employment was being terminated.[38]

Plaintiff claims that Kalonick treated him in a hostile manner at work, and that he treated Caucasian employees better.  During his deposition, plaintiff described Kalonick's allegedly hostile treatment as "just a general kind of way of treatment in the everyday office."[39]  More specifically, plaintiff testified that he was excluded from meetings at the office.  Also, when another employee of unidentified race made a racially motivated comment, Kalonick told her, "the more I teach you the dumber you get, let me show you how to do this."[40]  At some unidentified point in time, Kalonick passed in front of plaintiff's desk and whispered, "I am going to fire you."[41]  Plaintiff did not get as much attention as he wanted regarding the details of his payroll work. When he requested attention from Kalonick, Kalonick told him he would not help him because he did not know anything about payroll.[42]  Sometimes, Kalonick would

---

[38]Kalonick Affidavit, at 2.

[39]Torain Deposition, at 90.

[40]*Id.* at  90-91.

[41]*Id.* at 91-92.

[42]*Id.* at 93-94.

blame plaintiff for duplicate payments being made, when plaintiff had merely processed the vouchers or invoices presented to him by Kalonick.[43]  Plaintiff also testified that Kalonick emailed a picture to everyone in the Business Office that plaintiff found to be offensive.  Plaintiff testified that he thought the picture was meant to resemble a Ku Klux Klan hood, but he also acknowledged that the picture was a visual trick that was supposed to reveal the image of Jesus Christ.[44]  It is impossible to discern the date the email allegedly was sent, because, the "to," "from," and "date" lines have been deleted on the copy that was submitted to the court.[45]  Other, non-African-American employees were not excluded from meetings, and they did not receive copies of the article about the proposed letter of apology for slavery.[46]

Plaintiff showed the offending picture to Cutts during the last week of his employment, and Cutts informed plaintiff he did not think it looked like a hood.[47]  Plaintiff also showed Cutts a copy of the article about the proposed letter of apology

---

[43]Torain Deposition, at 95.  Kalonick testified that the error in processing vouchers and invoices was plaintiff's, not his.  *See* Kalonick Deposition, at 71-75.  However, at this summary judgment stage, all facts must be construed in the light most favorable to plaintiff.

[44]Torain Deposition, at 119-31.

[45]*See* defendant's evidentiary submission, at Tab 8.

[46]Torain Deposition, at 142-46.  Plaintiff also testified that Kalonick behaved more politely toward other, non-African-American employees, and that he did not make those employees feel uncomfortable.  However, plaintiff could not provide an example of this more favorable treatment in his deposition.  Plaintiff also stated that he was made to feel like an outcast, but he could not provide any examples of that treatment either, other than being excluded from office meetings.  *See id.* at 146-50.

[47]Torain Deposition, at 117-21, 133-34.

for slavery to Cutts during the last week of his employment.[48]  He told Cutts that the picture and the article proved that Kalonick was "ill motivated" in accusing plaintiff of poor job performance.[49]  Other than these two occasions during the last week of plaintiff's employment, plaintiff did not make any complaints to Cutts or anyone else at the Hospital or in the Department about employment discrimination or harassment of any kind.

After plaintiff's termination, the Hospital received four applications for the Accounting Assistant I position.  Two of the applicants were African-American.[50] Cheryl Torain, one of the African-American applicants, received the highest rating based upon the Applicant Evaluation Form only.[51]  However, once the Final Interview process had been considered in conjunction with the application forms, Amy Vinson, a Caucasian female born in 1969, was chosen to replace plaintiff as Accounting Assistant I, effective September 1, 2007.[52]  Ms. Vinson had some college courses in her educational background, but she never earned a degree.  She had previously worked for the Hospital as a Clerk, and her job duties included posting time cards,

---

[48]*Id.* at 133-34.

[49]*Id.* at 118.

[50]Plaintiff's evidentiary submission, Tab 15, at document bearing Bates Stamp No. 007560.

[51]*Id.* at document bearing Bates Stamp No. 007561.

[52]*See id.* at document bearing Bates Stamp No. 007560; Kalonick Deposition, at 19; Ethredge Deposition, at 50.

maintaining leave balances, updating leave cards, making sure leave balances in the system matched the master leave card, maintaining a filing system for leave records, and performing general office duties.[53]  Vinson's starting semi-monthly pay rate as an Accounting Assistant I was $965.90.[54]  In March of 2008, she received a two-step probationary increase to $1,039.50 semi-monthly.[55]  Her probationary period performance evaluation from February of 2008 reflected a mark of "consistently exceeds standards" in the following categories:  providing data processing entry, audit, and review functions; maintaining a systematic set of employee payroll records; operating and maintaining computer devices; performing other duties associated with the Purchasing functions of the Business Office; and serving as a back-up to various other duties and functions.[56]  Despite a Hospital policy dictating that documentation must be provided to support any rating of "consistently exceeds standards,"[57] there was no written justification or documentation to support Vinson's rating.[58]

Plaintiff also points to two other individuals as comparators who were outside

---

[53]Plaintiff's evidentiary submission, Tab 2, at documents bearing Bates Stamp Nos. 005617-005619.

[54]Plaintiff's evidentiary submission, Tab 16, at document bearing Bates Stamp No. 005616.

[55]*Id.* at document bearing Bates Stamp No. 005566.

[56]*Id.* at documents bearing Bates Stamp Nos. 005569-70.

[57]*See* Kalonick Deposition, at 42.

[58]Plaintiff's evidentiary submission, Tab 16, at documents bearing Bates Stamp Nos. 005569-70.

his various protected classes, and who were treated more favorably than he was. Robin Vest, a Caucasian female whose age is not revealed in the record, received a preappraisal form from Kalonick at the beginning of her employment, while plaintiff did not receive such a form.[59]   Furthermore, Vest's evaluation forms, taken as a whole, indicate that she lacked appropriate attention to detail, made excessive mathematical errors, and was easily distracted from her assigned tasks.  Despite those deficiencies, Vest was allowed to continue working for defendant, and she received higher scores on her evaluation forms than plaintiff did.[60]

Andy Slayton, a Caucasian male who was approximately thirty-six years old during the relevant time period, worked in the Accounting department of the Business Office at the Hospital.  Slayton experienced difficulties coding items in the computer system.  He erroneously coded somewhere between $66,000 and $307,000, and, as a result, that sum of money was lost.  Despite the fact that those errors occurred while Slayton still was in his probationary period, Slayton never was terminated or even reprimanded.[61]

### III. DISCUSSION

A.    **Abandonment of Claim for Constitutional Violations**

---

[59]Kalonick Deposition, at 29-34.

[60]*Id.* at 35-37.

[61]*Id.* at 165-67.

At the summary judgment stage, plaintiff has effectively abandoned his claim for a constitutional violation pursuant to 42 U.S.C. §§ 1981 & 1983.  He offered no response to defendant's arguments that summary judgment should be granted on that claim.  Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc*., 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted).

## B.   Race Discrimination

Plaintiff asserts that he was discriminated against based upon his race in the termination of his employment, and, that he was subjected to a racially hostile work environment.

### 1.   Termination

To establish a prima facie case of race-based discrimination in the termination of his employment,[62] plaintiff must show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) the employer replaced him with someone outside his protected class or otherwise treated similarly situated employees outside his protected class more favorably, and (4) he was qualified to perform the duties of his job.  *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001);  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.

---

[62]Plaintiff does not claim to have direct evidence of a race-based discriminatory animus. Therefore, he must prove his claims with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination.   To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action.   If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

1984).[63]

Defendant concedes that plaintiff is a member of a protected class, and that his termination constituted an adverse employment action.   Furthermore, the record clearly demonstrates that plaintiff was replaced by a Caucasian individual after his termination.   Thus, the only element of the *prima facie* case in dispute is plaintiff's qualification to perform the duties of his job as an Accounting Assistant I.   In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of his job often is not an issue.   *See Crapp*, 242 F.3d at 1020.   The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred."   *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983).   Here, given plaintiff's long work history with the Department, his qualification for the Accounting Assistant I position can be inferred. Further supporting plaintiff's qualification for the position are the following facts: (1) in his prior position as Administrator I, plaintiff was responsible for accounts

---

[63]To the extent plaintiff asserts his claim for race-based discrimination under both Title VII and 42 U.S.C. § 1981, the elements of proof are the same under both statutes.  *See, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

payable, contracts, billing, vouchering, and auditing; and (2) plaintiff's college education included courses in accounting, computer programming, keyboarding, and information systems.  Accordingly, plaintiff has satisfied all elements of the *prima facie* case for his racially discriminatory termination claim.

Defendant claims that plaintiff's employment was terminated because plaintiff failed to adequately perform his job duties.  That is a legitimate, non-discriminatory reason for the decision to terminate plaintiff's employment.  Accordingly, plaintiff can survive summary judgment on his race-based termination claim only if he comes "forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804 (1973)).  Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Chapman*, 229 F.3d at

28

1024-25. Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiff first relies upon his educational background and his history of performing similar duties for the Department in other positions to support his pretext argument. All that these facts establish, however, is that plaintiff could reasonably have been expected to perform the job duties of an Accounting Assistant I when he was hired for the position. While that may have been sufficient to satisfy the "qualification" element of the *prima facie* case, it in no way indicates that the reports of plaintiff's performance problems are "unworthy of credence." It can reasonably be presumed that employers will only hire applicants they believe are qualified for the position. Thus, to hold that any plaintiff who possessed the appropriate educational and work background at the time he was hired can always demonstrate pretext *based upon those factors alone* would be the same as holding that poor job performance will never hold up as a legitimate, non-discriminatory reason for a termination decision. There is no authority to suggest that the Eleventh Circuit would be inclined to adopt

29

such a rule.

Plaintiff also argues pretext based on defendant's failure to provide him an opportunity to improve his performance. The record does not support that assertion. Plaintiff first received negative feedback about his job performance on his February 2, 2007 Midappraisal form. That form provided several suggestions as to how plaintiff might improve his performance. Plaintiff again received negative feedback on his April 16, 2007 Working Test Period evaluation form, but he was given a Plan of Correction to improve his performance. Also, at that time, defendant requested permission to have plaintiff's probationary period extended for an additional three months, rather than terminating plaintiff's employment. Plaintiff's June 28, 2007 probationary period Midappraisal form again listed several areas in which plaintiff's performance needed to improve, many of which were the same areas that had been addressed in past evaluations, and also made recommendations for improving performance. Thus, the record reveals that defendant repeatedly gave plaintiff notice of the deficiencies in his performance and provided suggestions about how to improve. Plaintiff's contrary suggestion, that defendant failed to comply with Policy 60-17, which states that an employee who receives a rating below the "meets standards" level may be terminated *after three months* if progress has not been made in the employee's performance, is not supported by the record. According to plaintiff,

defendant did not allow him a full three months in which to improve his performance. However, the record reveals that plaintiff first received a ranking of "partially meets standards" on April 18, 2007, but that his employment was terminated more than three months later, on July 27, 2007.  It is irrelevant that Kalonick made the *recommendation* that plaintiff's employment be terminated less than three months after the April 18, 2007 evaluation.  Policy 60-17 cannot reasonably be construed to require the Hospital to wait three months after a sub-standard evaluation before it even *considers* terminating an employee.

Plaintiff also asserts pretext based upon the fact that Kalonick, who allegedly is biased against him, recommended to Cutts that plaintiff be terminated. It is true that "an employer may be held liable for employment discrimination if the actions of a neutral decision maker are somehow influenced by the prejudice of a non-decision maker." *Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1125-26 (S.D. Ala. 2000) (citing *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991); *Jones v. Gerwens*, 874 F.2d 1534, 1541 n.13 (11th Cir. 1989)).  Even so, there is no evidence that Cutts made the decision to terminate plaintiff's employment based solely upon Kalonick's recommendation.  There also is no evidence that Kalonick's recommendation was the result of a race-based animus, and not plaintiff's job performance issues.  Plaintiff

31

asserts that Kalonick engaged in two "racially hostile acts,"[64] *i.e.,* forwarding plaintiff a picture of what plaintiff perceived to be a Ku Klux Klan hood, and attaching a copy of an article discussing a proposed legislative apology for slavery to plaintiff's last Midappraisal form.   However, as discussed more fully in the section below, addressing plaintiff's race-based harassment claim, neither of these actions demonstrates a discriminatory animus.   Furthermore, even if Kalonick's acts did constitute proof of a discriminatory animus, they still would not be sufficient to discredit defendant's proffered legitimate reason for plaintiff's termination.

In summary, plaintiff cannot demonstrate that defendant's proffered legitimate, non-discriminatory reason for terminating his employment was merely a pretext for race discrimination.   Accordingly, summary judgment is due to be granted on plaintiff's claim for race-based discrimination in the termination of his employment.

## 2.    Harassment/Hostile Work Environment

Plaintiff also claims that was "subjected to . . . hostile work environment, intimidation and harassment, because of his race and color.  Said actions on the part of his employer were severe and pervasive and tended to interfere with plaintiff's ability to perform his job."[65]

---

[64]Doc. no. 20 (plaintiff's brief), at 18.

[65]Amended Complaint, at ¶ 28.

Plaintiff must provide proof of five elements to establish a racially-hostile work-environment claim:   *i.e.*, (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon his race, color, or national origin; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment and create a discriminatory abusive working environment; and (5) his employer is liable for the environment under a theory of either direct or vicarious liability.   *See, e.g., Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002); *Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994).[66]

Plaintiff can easily establish that he belongs to a protected group, as he is an African-American.  Furthermore, plaintiff was subjected to treatment he found to be objectionable.  He was excluded from meetings and otherwise made to feel like an outcast.  He also overheard a co-worker making a racist comment, then witnessed a supervisor reprimand the employee for not "doing it right."  Finally, plaintiff received two documents from Kalonick that he believed were racially offensive:  the email attachment depicting the face of Jesus Christ, and the newspaper article discussing a proposed legislative apology for slavery in the State of Alabama.  Even so, plaintiff cannot prove that any of this objectionable behavior was based upon his race, or that

_____

[66]These elements are the same under both Title VII and § 1981.  *See Standard*, 161 F.3d at 1330.

any racially offensive behavior was sufficiently severe or pervasive to alter the terms

and conditions of his employment and create a discriminatory abusive working

environment.

"Title VII does not prohibit all verbal or physical harassment in the workplace;

it is directed only at 'discriminat[ion] . . . *because of* . . . [race].'" *Oncale v.*

*Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis supplied); *see*

*also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1254 (11th Cir. 1999) ("Title VII was

never intended to protect employees from all unpleasant and rude conduct in the

workplace.") (Edmondson, J., concurring).  The "critical issue," according to the

Supreme Court, "is whether members of one [race] are exposed to disadvantageous

terms or conditions of employment to which members of the other [race] are not

exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S.

17, 25 (1993) (Ginsburg, J., concurring)).  Stated somewhat differently,

> [t]he essence of a disparate treatment claim under Title VII is that an
> employee or applicant is intentionally singled out for adverse treatment
> on the basis of a prohibited criterion.  . . .  In proving a claim for a
> hostile work environment due to [racial] harassment, therefore, the
> plaintiff must show that *but for the fact of her* [*race*], she would not
> have been the object of harassment.  . . .

*Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982) (citations omitted)

(emphasis supplied).  "[U]nfair treatment of an employee, standing alone, does not

34

make out a Title VII case; *the mistreatment must be because the employee was* [*African-American*]." *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (emphasis supplied).

Furthermore, personal conflicts between two employees cannot serve as the basis for a Title VII claim, if they do not arise from the aggrieved employee's membership in a protected category. "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place.  Personal animosity is not the equivalent of [race] discrimination. . . .  The plaintiff cannot turn a personal feud into a [race] discrimination case. . . ." *Succar v. Dade County School Board*, 229 F.3d 1343, 1345 (11th Cir. 2000) (*per curiam*) (quoting *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (footnote and internal quotation marks omitted)). Regardless of the factual context in which the employees' dispute arises, the court's analysis of a Title VII harassment claim should focus "only on whether the complaining employee was targeted *because of*" his membership in a protected category. *Succar*, 229 F.3d at 1345 (emphasis supplied).

Here, plaintiff did testify that no non-African-American employees were excluded from meetings, but there is no evidence that Kalonick whispered about firing plaintiff, refused to assist plaintiff with his payroll duties, or blamed plaintiff for work errors that were not his fault *because he is black*.  Kalonick never made any

35

race-based comments, and plaintiff has not demonstrated that other, non-African-American employees were treated differently.  Kalonick's reaction to the employee who made a race-based comment also has no definitive race-based connotation. Kalonick could just as easily have been attempting to "teach" the employee *not* to make race-based comments.  There also is no evidence that the picture plaintiff received via email from Kalonick has any race-based connection.  Plaintiff claimed the picture was offensive because it resembled a Ku Klux Klan hood, but he subsequently acknowledged that the picture was intended to be a depiction of the face of Jesus Christ.  He offered no explanation of why a picture of Jesus Christ should be considered racially offensive.  Furthermore, it is undisputed that Kalonick sent the picture to *all* of the employees in the office, including both Caucasian and African-American individuals.  Finally, it is difficult to discern how the article discussing the potential legislative apology for slavery could be considered racially offensive.  The court recognizes, of course, that the institution of slavery is a badge of shame in our nation's history, and that the topic of slavery continues to be a highly sensitive matter. Even so, it does not follow that any mention of the topic in a historical sense must be avoided for fear of invoking an allegation of racial harassment.  The newspaper article plaintiff received discussed the topic in a delicate, impartial, and sensitive manner.  If anything, the article highlights the tragedy of slavery, likening to the

36

institution to "dehumanization," "injustice," and a deprivation of "human dignity." The article also emphasizes the need for an apology in order to promote healing and reconciliation among the races.  The mere fact that the article addressed the topic of slavery does not mean that it was a vehicle for race-based harassment.

Even if the court were to give plaintiff the benefit of the doubt and construe the article and plaintiff's exclusion from meetings as forms of race-based harassment,[67] plaintiff cannot demonstrate that the harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment and create a discriminatory abusive working environment.  The "severe or pervasive" element contains both an objective and a subjective component.  To satisfy this element, plaintiff must show *both* that he subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g., Harris,* 510 U.S. at 21-22.

When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson v. Booker T.*

---

[67]The individual statements and acts complained of must each be (or arguably be) of a racial nature *before* they may be taken into account when determining whether, when considered collectively, they were sufficiently severe or pervasive to create an actionable hostile work environment.  *See Gupta*, 212 F.3d at 583.

*Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (quoting

*Mendoza,* 195 F.3d at 1246); *Edwards v. Wallace Community College,* 49 F.3d 1517,

1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.

However, the factors, taken together, must reveal conduct that is so extreme that it

caused a material change in the terms and conditions of plaintiff's employment and

created a working environment that a reasonable person would find discriminatorily

abusive.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

(citations omitted).

Here, the behavior to which plaintiff was subjected, taken as a whole, simply

does not add up to a hostile and discriminatorily abusive work environment.  As an

initial matter, the severity factor does not weigh heavily in plaintiff's favor, because

any connection between the behavior to which plaintiff was subjected and plaintiff's

race is tenuous at best.  Further, with regard to the frequency factor, plaintiff may

have regularly been excluded from meetings, but he only received a copy of an article

about slavery on one occasion.  There was nothing threatening about any of the

behavior plaintiff was subjected to.  Plaintiff could reasonably have been humiliated

by his exclusion from meetings, but not by the slavery article.  The court can

understand the *potential* for humiliation in the receipt of such an article, but there

simply is no indication that anyone else in the office was *actually* aware that plaintiff

received it.  Finally, there is no indication that any of the allegedly offensive behavior unreasonably interfered with plaintiff's work performance.  Plaintiff does not argue that his work performance suffered as a result of being excluded from meetings. Furthermore, he did not receive a copy of the article about a proposed apology for slavery until just a few weeks before his employment was terminated.  By that time, plaintiff's job performance had already been regularly criticized, and there is no indication that his receipt of the newspaper article caused a further decline in performance.

Because plaintiff cannot establish all the elements of his race-based hostile work environment claim, summary judgment is due to be granted on that clam.[68]

## C.    Age Discrimination

It is debatable whether plaintiff still intends to pursue his claim for age discrimination in the termination of his employment.   He makes only passing reference in his brief to such a claim.  Giving plaintiff the benefit of the doubt, however, the court will consider the claim.

In order to make out a *prima facie* case for an ADEA violation based upon termination of employment, the plaintiff must show (1) that he was a member of the

---

[68]Similarly, to the extent plaintiff also intended to assert a claim for hostile work environment based upon his age, he cannot support such a claim.  There is *no* evidence of any hostile treatment on the basis of plaintiff's age.

class of persons protected by the ADEA, that is, individuals between the ages of 40 and 70,[69] (2) that he was discharged, (3) that he was qualified to perform the duties of the job from which he was dismissed, and (4) that a substantially younger person replaced him. *See, e.g.*, *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142 (2000); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656-57 (11th Cir. 1998). Defendant disputes only the third element, *i.e.,* that plaintiff was qualified to perform the duties of his job,[70] but the court has already found in Section III(B)(1), *supra,* that plaintiff does satisfy that element.

Defendant has proffered a legitimate, non-discriminatory reason for the termination of plaintiff's employment, *i.e.,* deficiencies in plaintiff's job performance. However, as discussed more fully in Section III(B)(1), *supra,* plaintiff cannot demonstrate that defendant's proffered reason is actually a pretext for discrimination. The reasoning employed in the discussion of pretext in the context of plaintiff's race-based termination claim is equally applicable to this discussion of plaintiff's age-based termination claim.

In summary, defendant has offered a legitimate, non-discriminatory reason for

---

[69]The protections of the ADEA extend to those individuals who "are at least 40 years of age but less than 70 years of age." 29 U.S.C. § 621(a).

[70]*See* doc. no. 19 (defendant's brief), at 22 ("The Defendant would concede (for the purposes of this submission) that the first three prongs of a *prima facie* case pursuant to the ADEA can be established, but would assert that the evidence developed thus far in this case is undisputed that the Plaintiff was not qualified to do the job from which he was terminated.") (emphasis supplied).

the termination of plaintiff's employment, and plaintiff cannot demonstrate that defendant's proffered reason is merely a pretext for age discrimination.  Accordingly, summary judgment is due to be granted on plaintiff's claim for discriminatory termination pursuant to the ADEA.

## D.     Retaliation

"Retaliation is a separate violation of Title VII."  *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 586 (11th Cir. 2000).  A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation:  (1) he engaged in statutorily protected expression;[71] (2) he suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer  a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000)

---

[71]"Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

(citations omitted).

Defendant does not dispute that plaintiff can satisfy the first two elements of the *prima facie* case.  Plaintiff engaged in statutorily expression when he showed the picture and article to Cutts during the last week of his employment, and told Cutts he thought the two items were proof of Kalonick's "ill motivation" toward him.  *See Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)) ("Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment.").  Further, the termination of plaintiff's employment clearly was an adverse employment action.  *See Llampallas v. Mini-Circuits Lab, Inc.,* 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination is the "classic and ultimate 'tangible employment action'").

However, plaintiff cannot establish a causal connection between his protected activity and his subsequent termination.  To be sure, the demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial.  At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d

42

1564, 1571-72 (11th Cir. 1993)).  "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.").  *See also*, *e.g.*, *Gupta*, 212 F.3d at 590 ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).  "Close temporal proximity between the protected activity and the adverse action *may* be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Commissioners,* 256 F.3d 1095, 1119 (11th Cir. 2001) (citing *Gupta*, 212 F.3d at 590) (emphasis supplied).

Here, it is clear that Cutts was aware of plaintiff's protected expression before the termination decision actually had been effectuated.  However, it is impossible to determine whether Cutts was aware of plaintiff's protected expression when he made the decision to terminate plaintiff's employment, because the record is not clear as to the exact date on which plaintiff complained to Cutts.  Giving plaintiff every benefit

43

of the doubt, the court will assume that Cutts was actually aware of plaintiff's protected expression when he made the decision to terminate plaintiff's employment.[72]   Furthermore, plaintiff made his complaints within a week of his termiantion.   Therefore, the temporal proximity between plaintiff's protected expression and his subsequent termination is very close.   The court concludes that these two factors — the decisionmaker's knowledge of plaintiff's protected activity and the close temporal proximity between the protected expression and the subsequent termination — are sufficient to establish a causal connection.   Thus, plaintiff has satisfied all elements of the *prima facie case* on his reataliation claim.

Defendant asserts that plaintiff's employment was terminated because of the deficiencies in his job performance, not because of retaliation.   Once again, that is a legitimate, non-retaliatory reason for the termination decision.

Plaintiff cannot establish that defendant's proffered legitimate reason actually

---

[72]It is also possible, based on the record before the court, that Cutts had already made the decision to terminate plaintiff's employment before plaintiff ever complained to him about Kalonick's behavior, but that Cutts simply had not yet informed plaintiff of that decision.  Plaintiff testified that he showed the picture and the article to Cutts during *the last week* of his employment, but Cutts testified that he made the termination decision on July 12, 2007, after he met with Kalonick.  The termination was not actually implemented until July 27, 2007.  Therefore, if plaintiff did complain to Cutts during the last week of his employment, the complaint would have occurred *after* the termination decision already had been made. Despite all of these conclusions, the court is striving to give plaintiff every possible benefit of the doubt.  Plaintiff's testimony was less than entirely clear about the exact date on which he complained to Cutts.  The court will construe all possible inferences from the evidence in the light most favorable to plaintiff and assume that plaintiff complained to Cutts *before* Cutts decided to terminate plaintiff's employment.

was a pretext for a retaliatory motive.  In fact, plaintiff does not even attempt to argue pretext in his brief, nor can the court imagine any attempt to do so that would be successful.  Even though the final decision to terminate plaintiff's employment may not have been made (or at least was not implemented) until *after* plaintiff complained about Kalonick's allegedly harassing behavior, it is clear that plaintiff's performance problems began well *before* plaintiff made any kind of complaint.  Plaintiff first received a performance evaluation with negative feedback on February 2, 2007, and he received two additional negative evaluations, plus an extension of his probationary period, before he complained to Cutts sometime in July of 2007.  The fact that plaintiff's performance problems began to develop before he ever complained of any protected activity lends support to defendant's justification — *i.e.,* that plaintiff was terminated as a result of poor performance.  Furthermore, as discussed above in Section III(B)(1), plaintiff has failed to otherwise discredit defendant's proffered reason.

As plaintiff has failed to demonstrate that defendant's proffered legitimate reason for the decision to terminate his employment was merely a pretext for retaliation, summary judgment is due to be granted on plaintiff's retaliation claim.

## IV. CONCLUSION AND ORDER

In accordance with all of the foregoing, defendant's motion for summary

45

judgment is GRANTED, and it is ORDERED that all of plaintiff's claims be, and the same hereby are, DISMISSED with prejudice.[73]   Costs are taxed to plaintiff.   The Clerk is directed to close this file.

DONE this 4th day of August, 2010.


_____
United States District Judge

---

[73]Because all of plaintiff's claims are being dismissed on their merits, it is not necessary for the court to consider plaintiff's argument that any claims for reinstatement or frontpay should be dismissed due to the effects of after-acquired evidence.

46